May it please the Court again, we are dealing with a 417 patent and a decision by the Patent and Appeal Board. There is a marked difference between the Kornberg reference and our 417 patent. Dr. Rhodes identified very specifically in Column 3 of his 417 patent similar to the Kornberg reference. Just to be clear, your sole argument about anticipation is the claim construction as to the cause of the tightly engaged, which you say the fluid force has to be the solid force. Not the sole cause, it has to be the cause to tightly engage. We're not saying this is sole cause, but we cannot say it has to be to tightly engage, which means that it can be engaged upon deployment, but it cannot be tightly engaged. So the difference between Kornberg and the other references cited in Column 3 is that you had active fixation using hooks upon deployment. So are you agreeing that if the fluid force contributes to the tight engagement, that that's covered by the claim? The fluid flow force is what causes the tight engagement after deployment. Big difference than engaging or tightly engaging the earlier prior art references, including Kornberg. You put it in and you want it to stay. And, in fact, Kornberg in 1984 was not even a stent. It was a sleeve with long parallel struts, and you wanted to get it in there and secure it, and you contemplated that it would go all the way through and pierce the vessel wall like a hook. And what Kornberg said is let's put plugs there so no fluid comes through. What I'm trying to get at is what you say the correct claim construction is and where the board went astray. You say it doesn't have to tightly engage solely as a result of the fluid force, right? No, Your Honor. We're saying it cannot tightly engage upon deployment, which is what Kornberg and all the other art, the Chutter reference, the Lazarus reference, the Trout reference, identified in Column 3. Dr. Rhodes says these are good patents for their intended purpose of retention. But notwithstanding, a need exists for means of ensuring good retention from migration because when you put something in on deployment and tightly engage it like a nail in the wall, the fluid flow force will cause it to tear or perforate, which will have the effect of loosening it. Dr. Rhodes said, wait a minute, we were solving a problem of getting stents. So if the fluid force causes it to continue to tightly engage, that's not covered? Yes. If it is tightly engaged upon deployment, then that's not our claim. That's not our invention. What Dr. Rhodes says is the objective of his patent. So you're saying even if the fluid force causes it to continue to be tightly engaged, that's not covered? It's a fluid flow force. Yes, if it is tightly engaged on deployment, that is – and the definition, if it goes all the way through, if it fixably secures is the language. If it fixably secures, then what Dr. Rhodes was saying, you have problems that come about. Well, suppose there's a risk that it's going to become untightly engaged in the course of its use. And the fluid force helps to ensure that it remains tightly engaged. That's not covered? No, that is. That's his invention. His invention is get it in there. Let the radial forces of the blood flow. Well, that's what Kornberg did too. No. Kornberg said was a manual deployment by the physician to pull him and hook him like a fish. You pull the line and you hook it and you secure it. But what the board is saying that thereafter the fluid force helps to keep it tightly engaged, right? But what we showed and what Dr. Silver explained and what the Molina article in 1998, which is what we think the PTAB did not appreciate, we showed the Molina article in 1998 said, wait a minute, here's a study that in 1998 we see problems with tightly engaging it, securing it on deployment because migration will cause problems. So we should figure out a way to just put it there and let the fluid flow forces lock it in. The problem with Molina is that Dr. Rhodes came up with that five years earlier. His objective was one of the last objective on column three is an anchoring means come up – it is the object of the invention to come up with an anchoring means that does not pose a significant risk of perforating the tissue, vessel, or lumen. Because of the angle, an acute angle, he did not want it to go in. But Dr. Rhodes was in the space. His 154 patent, which was earlier that we just talked about, dealt with the issue of a stent graft. And the science and the art in the late 80s and early 90s was let's come up with stent grafts, the Palmol stent, the Jean Turco stent. What happened is that said, okay, we get it in place. And Dr. Rhodes said, well, wait a minute. We did a great thing, but we can make it better because that causes additional problems. So let me go about and try to fix those additional problems. So what we submit is what the PTAC did is they conflated the radial force of blood flow going outward that holds the stent in place with the downward flow force of blood flow. And what the 417 is replete with is, and even in the abstract, is to tightly engage under the force applied by the fluid flowing through the device. But that's what was asked at the outset. Are you arguing a claim construction that the 417 requires the tightly engaged to only come from the fluid flow and not from any initial engagement? And you said no. No, I misspoke then, Your Honor. I apologize. I apologize, Your Honor. The fluid flow force, the tightly engaged, has to be as a result of the fluid flow force. Solely? The claim says to cause tightly engaged. Well, is it solely or not? I don't think it's solely at that time, but it's after. Kornberg was about active fixation on deployment by manually pulling it, and the claim language also says fixedly secure. Well, it can't be solely, right? Isn't it the projection? The fluid flow forces the projections, which in combination cause it to be tightly engaged. Yes, it's the anchors. So it's not the fluid flow alone. It's the anchors plus the fluid flow. So it's not solely fluid flow. It is the structural design with the functional limitation of the whereupon cause, which is a limitation that says you do the structural design of the anchors with the leading portion and the trailing portion at an acute angle, and there will be some engagement on deployment where it talks about burrowing. But the fluid flow force and the migratory forces cause it to move in a downward position, and as it moves downward, it locks in because what was happening before then, the problem was you were causing perforation. Like if you put a painting on a wall with a nail that doesn't support it, what happens to the sheetrock? It starts to come under the weight and moves. So it was fixably secure, and then it became not fixably secure. That's what Dr. Rhodes was talking about here is we definitely want some engagement on deployment. We want radial forces acting on it. So it's not solely. I apologize. You are correct. Because the radial force of the blood flow is also causing it to stay in place. But we want to take advantage of the migratory effect of the downward flow of the blood, and that downward flow, the combination of everything, is causing it at that point in time to fixably secure, tightly engage. And the claim says to cause. It doesn't say to maintain. And if you accept the PTAB's definition, you're reading the word tightly out of the claim. Tightly is in the abstract. It's in the summary of the invention. I don't understand why it's doing that. I mean what the board is saying is, first of all, the distal end, that it is the fluid flow alone, as I understand it, which causes the tight engagement. And with respect to the other part, that the tight engagement is maintained as a result, in part, of the fluid flow. So why isn't that covered by the claim? Because what Dr. Rhodes said is you have a trailing portion at an acute angle that will not penetrate or tightly engage on deployment. Remember there's a leading portion and a trailing portion. And we're talking about the trailing portion, what happens to the trailing portion based on the fluid flow force. And it's the trailing portion that tightly engages. If Kornberg teaches to tightly engage on deployment, there's nothing left of our claim and it becomes superfluous. Our claim, because Dr. Rhodes was in that space, and I believe that when you look at Column 3, Dr. Rhodes says, while such anchoring means are believed effective for their intended purpose, they never appear to be amenable to improvement. And then he says, here are various disclosed devices used in anchoring, shutter, these others, which is no different than Kornberg. They came later in time. He said, notwithstanding, a need exists for means of ensuring good retention from migration for intraluminal grabs. He said, let me make it a little better. He was in the art. And nothing about his 1-5-4 patent teaches or motivates the idea of combining his 1-5-4 patent with hooks, because he knew about hooks. He disclosed hooks. But he said they're different, and it's that whereupon clause. And so the state of the art at the time has to be that it's for the issue of an inherency that the panel goes off on, that it has to be known by one of skill at the time of the invention that you tightly engage after deployment. And there's nothing in the record except our evidence that it was not known, which is confirmed by Dr. Rhodes. And if you look at his 1-5-4 disclosure and what he says about it here. So with that, I'll reserve the rest of my time. Okay. Thank you, Mr. Senator. Mr. Goldman? May it please the court, Kevin Goldman with my colleague Mark Fleming on behalf of the appellees, Medtronic Inc., Medtronic Vascular. There are three main issues I'd like to address today. First, the board's construction of the whereupon clause is correct. The claims, the specification, and the prosecution history all say the same thing. The device must be structurally capable of having blood flow help cause and maintain tight engagement. Second, there is substantial evidence that Kornberg discloses the whereupon clause. Kornberg's structure permits it to have blood flow apply a force onto the projections so it tightly engages the vessel wall. That's what Kornberg says, and both their expert and our expert agreed on that. Finally, we know that Kornberg inherently discloses this feature because it has the exact same structure as the end-attack patent. There's no structure present in Kornberg that has to be removed to bring within the scope of the claims. There's no structure missing from Kornberg that has to be added to bring it within the scope of the claims. I thought that Kornberg thought that the projections are protected from blood flow by the resilient ring and therefore couldn't cause tight engagement. That is one option within Kornberg, Your Honor, but Kornberg says that the ring is optional and it is not necessary. And as the board found as a factual matter, what that means is that Kornberg encompasses and teaches a particular embodiment where there is no puncturing because there's no need for that ring. Just so I know, where does it say it's not necessary? That is in Column 6 of Rhodes. No, we're talking about Kornberg's disclosure. I'm sorry, Column 6 of Kornberg where it says that the ring is not necessary. Do you happen to remember where, by any chance? I believe it's Column 6. I do not have the exact line number, Your Honor. But again, what we know is that they cannot point to a structure within Kornberg that needs to be added or removed. The only alleged difference is the method of deployment, and that's not a basis for distinguishing prior art in an apparatus claim. First, on the issue of claim construction, because it's an apparatus claim— I don't see a location, so I'm probably missing it. It does say it should be noted that there can be variations of this device and grafting procedures such as using a straight tube, but I don't see where it says the ring is optional. So I'm sure you're right. I just don't see it. Where do you see it? I'm sorry, it's Column 4, Your Honor. I apologize. It's Column 4, lines 14 to 16. It says that it is contemplated that a graft could be made without the resilient ring. And again, what that shows is that Kornberg teaches a device that fully matches the structure described in Endotax Patent. But turning back to the issue of claim construction, because this is an apparatus claim, the whereupon clause can only refer to the physical arrangement of the device. The Board recognized this and properly construed the clause to refer to the physical capability with respect to blood flow. The word whereupon appears twice in the claim, and both times it's referring to the intended result of blood flow on the acutely angled projections. The whereupon clause does not recite a separate structure. And this was not an accident. This was by design. What the specification says is that the inventor intended to encompass within his invention any form of projections as long as they were acutely angled. And this is in the patent in column 9, lines 1 through 17. It specifically spells out that the particular shape of the projection doesn't matter. What matters is that it's acutely angled, because that's what enables the device to tightly engage the vessel wall. And the prosecution history says the same thing. The application was rejected as anticipated by Rhodes, and the inventor added specific structural elements reciting the leading portion, the trailing portion, and the trailing surface extending at an acute angle, and said that it's that structural limitation that enables the tight engagement. And this leads to our next point, which is that the whereupon clause does not have separate patentable weight, because it does not describe additional structural limitations. It simply describes the intended effect of blood flow on the projections. And the law on this issue is clear. A statement of intended result does not have separate patentable weight. You can see this in the Texas Instruments case. There you had the claim for citing a specific structure, and then used a whereby clause to describe the intended result. And what if the whereupon clause, the reading of it, was that the blood flow was the only thing that could cause the tight engagement, rather than it could cause the tight engagement in conjunction with something else, which I think is what the board found. I know you disagree with that, but that seems, at least until the argument this morning, that seemed to be the heart of this case, is whether the whereupon clause was limited to the blood flow was the only thing that could cause the tight engagement. If the whereupon clause was limited to only blood flow causing tight engagement, it would exclude the preferred embodiment, and it wouldn't make sense as a matter of physics, because you can't just have blood flow alone causing anything. The way the device is— Well, with the structure. I mean, I'm not reading out the structure, but it seems like their argument was you put this in, and there may be initial engagement, but it's not tight engagement. It's only the blood flow that causes the tight engagement, and that's the only way you get tight engagement under their patent, whereas under Kornberg, at least the board's reading is, you put it in, you have tight engagement already, and the blood flow keeps it tightly engaged. Two responses. That's actually not what the board found with respect to Kornberg. What they found with respect to Kornberg is just that the doctor's insertion can play some role in that initial engagement, but the board did not find that engagement was tight. But second, if you're having blood flow be the sole cause of tight engagement, then you're adding back in a method limitation, and that obviously can't be right with an apparatus claim because whether or not blood flow is the trigger that changes engagement to tight engagement will depend on the method of how it's deployed. The same device could either have a lack of tight engagement or not a lack of tight engagement, depending on the method of employment. And this goes to the nail metaphor that Enotac has brought up several times. They refer to Kornberg as if a doctor is like a carpenter hammering in a nail, but that metaphor doesn't help them. You could have a nail that gets hammered in completely by one person, or you could have a nail that gets hammered in partially and is left loose so other forces can come in and play a separate role. The same nail, two different methods of applying it. You can't use a method of deployment to distinguish an apparatus claim. That's the only basis that Enotac has to distinguish Kornberg here. And again, turning specifically to the issue of Kornberg, they make the point in their brief that the board only relied on one snippet of Kornberg to make this finding, but that's not correct. The board relied on multiple passages from Kornberg, on the testimony of Medtronic's expert, on the testimony of Enotac's own expert, and on the Molina article that Enotac itself submitted in support of its position. So the board had ample substantial evidence to make this factual finding. And first, Kornberg itself explains that blood flow is playing a role in the engagement of the device. It specifically says that the downward flow of blood is holding the distal graft limbs in place. The board properly relied on that evidence. Enotac's response there is that the distal end is the upstream end, and it's not referring to the proximal end. But what the board found as a factual matter, and correctly so, is that it's a solid projection. It's connected. So force on the distal end is necessarily also acting on the proximal end. That's why blood flow is holding the graft in place. If it wasn't, then the blood flow would be causing the graft to move. It's only because the blood flow is pushing it more tightly into the vessel wall that the force of blood flow keeps the graft open and holds it in place. And again, this is supported by the testimony of Medtronic's expert. He explained that this is a matter of basic physics. When you have forces applied to an acutely angled projection, it necessarily and inherently pushes the force more tightly into the vessel wall. So Kornberg is structurally capable of having blood flow-tight engagement. And it's that structural capability that is the essence of the board's construction and the essence of the claim itself. An end-to-tax expert agreed that blood flow is acting on Kornberg in this manner. He explicitly conceded that when you have Kornberg in a vessel, the fluid forces are pushing and holding on the device. That's what's described in the patent. And the Molina article confirms what our experts said and what their experts said. Acutely angled projections inherently allow blood flow to cause and maintain tight engagement. I'd like to briefly turn to the issue of obviousness. Now, Mr. Rhodes' patent was originally rejected based on his prior art, Rhodes' patent. And what he said was, this new patent is identical except for the anchoring means. That's it. And the anchoring means is just the acutely angled projections. You look through the patent, it describes a few particular embodiments of acutely angled projections. It talks about the arrow-shaped projections and the wedge-shaped projections. But then it says that particular shape of the head does not matter. What matters is that the projection have an acutely angled orientation. That's it. That element is taught by Kornberg. And it's important to note that Endotax did not dispute the board's factual finding that Kornberg has that acutely angled projection. Endotax did not dispute the board's factual finding that a person of ordinary skill would have been motivated to combine Kornberg with Rhodes. That's all that this court needs to affirm the board's obvious determination. It's plainly correct. And I'd like to turn back very briefly just to the issue of claim construction and respond to something that Mr. Souter said earlier. On the issue of whether or not blood flow force is the sole force, that was their argument below. And the reason that can't be right is a matter of physics. You can't just have blood flow alone causing anything. In the preferred embodiment, the device goes in and has to be expanded. You need other forces to be operating on the device so that it expands. And those other forces can cause that initial engagement. Any construction of the claim that requires blood flow to be the sole cause would necessarily read out the preferred embodiment. That cannot be correct. Unless the court has any further questions. Thank you, Mr. Olin. Kornberg is about manual deployment. That's what the prior art, that's what Dr. Rhodes talks about with his patent, his 154, and the other prior art. I invite the court to review column 3 of the patent. It says it all right there. We are dealing with after deployment. Does the fluid flow cause the anchor, the trailing portion, to tightly engage? It causes it and maintains it. On the issue of that whereupon and structural, I cite the court to the Moore v. Standard Register that there's nothing wrong with defining structure in terms of the environment in which it is used. And the HTC v. IM's IPCOM case that distinguishes a case like IPXL where you require input from a user. We're dealing with when the claim establishes a function of the underlying environment in which it operates. Medtronic tried to argue below that it was not, whereupon clause is not a limitation, and we briefed that, and I'm not sure if they're arguing it again here, but the panel did not, PTAP did not rule on it and treated it as a limitation. I would just like to end with the Molina quote, the Molina article in 1998, which goes to the issue of inherency, and what is known at the time of the invention, five years earlier, is the Molina article identifies a problem, and it says when it discusses its findings of late migration, it says in 1998, rather than being pushed into the aortic wall by the radial force of the stent, the hooks and barbs now engage the aortic wall when the stent graft is pulled distally by the bloodstream. The angle between the stent and its hooks and barbs is important for this action. So in 1998, Dr. Molina is saying earlier art had a problem. Let's not tightly engage, I'm paraphrasing, but let's let the stent graft pull distally by the bloodstream. That's exactly the problem that Dr. Rhodes identified after his 154 patent, after these prior anchors were out there, the Chutter, the Kornberg, the others, and said, wait a minute. We did a great thing here medically, but it can be better. So he says in column three, we can improve upon it because once we did a great thing and put a stent graft in there with hooks, it caused problems. Now let's go about and solve those problems. And that's what the 417 set about to do, and that's why it's not obvious and why Kornberg dealt with nothing that wasn't disclosed and considered by Dr. Rhodes in the patent office. It was known art of using anchors, but there are problems with the way they're being used. I need to fix it. And I believe that the PTAB erred in finding inherency when there's nothing to show. In fact, the evidence shows that it was not known at the time of the invention that this problem could be remedied. And there's no evidence other than that it is speculative whether Kornberg would have helped back in 1993. So with that, we ask that the panel decision be reversed and that the patent be deemed valid. Thank you. Thank you, Mr. Sitter. Thank both counsel. The case is submitted.